DUPONT ET AL. *v.* UNITED STATES.

No. 332.   Argued January 11, 1937.—Decided February 1, 1937.

*Mr. Irving Mariash,* with whom *Mr. I. Maurice Wormser* was on the brief, for petitioners.

*Mr. Thurman Arnold,* with whom *Solicitor General Reed, Assistant Attorney General Jackson,* and *Messrs.*

*Sewall Key* and *George H. Zeutzius* were on the brief, for the United States.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Section 800, Schedule A (4) of the Revenue Act, 1926,[1] imposes a stamp tax upon "each sale, agreement of sale, or agreement to sell (not including so-called transferred or scratch sales) . . . at, or under the rules or usages of, any exchange . . . for future delivery." Whether the tax is payable upon a broker's transfer of a customer's account in cotton futures to another broker through the cotton exchange is the matter in controversy. The Circuit Court of Appeals has held the transaction taxable.[2] A conflict of decision moved us to grant certiorari.[3]

Petitioners are members of a partnership trading on the New York Cotton Exchange. On behalf of a customer they purchased cotton for future delivery. They were instructed by the customer to transfer the account to other brokers. To accomplish this petitioners delivered a "sold" memorandum to the transferee of the account, who, in turn, delivered a "bought" memorandum to the petitioners. No commission was charged because the instructions to transfer had been given at petitioners' request, as they desired to be relieved of the account. In order to record such a transfer with the exchange the custom was to use bought and sold memoranda in the form invariably employed by members of the exchange in purchase and sale of cotton for future delivery. The petitioners affixed to the sold memorandum stamps in the proper amount and after denial of a refund, brought action for the amount of the tax.

---

[1] 26 U. S. C. 903.

[2] 83 F. (2d) 951.

[3] See *United States* v. *Uhlmann Grain Co.*, 84 F. (2d) 901.

The petitioners contend that no sale, agreement of sale or agreement to sell was in fact made, though for convenience, and because of lack of other medium to evidence the transfer, papers in form agreements of sale were employed. The government insists that the tax is essentially upon the privilege of using the facilities of an exchange and petitioners here exercised this privilege and a sale was in fact made. We hold the tax was lawfully imposed and the petitioners are not entitled to recover the value of the stamps.

1. The transaction was not a "scratch" or "transferred" sale within the meaning of the exemption found in the section. A scratch or transferred sale is one in which there is an offsetting purchase and sale at the same price on the same day. Where a broker, in order to fill a customer's order, buys a larger amount and sells the excess to a third broker, directing the selling broker to deliver the excess to the broker who has purchased it, and directing the broker who purchases the excess to take delivery from the selling broker, the name of the intermediate broker is erased from the records of the exchange so that the sale of the excess appears as a sale direct from the one to the other of the two remaining brokers. The exemption also covers trading by a scalping broker who makes his profit in fractional movements on the exchange, buying and selling with great rapidity, thus often purchasing and selling the same amount of the commodity at the same price within a few moments or hours. By agreement amongst the members his name is scratched out of the records of the exchange and his temporary rights and liabilities do not appear upon its records. Accordingly, the Treasury Regulations in force since 1918 require that purchase and sale be consummated on the same day if the exemption is to apply

and that the intermediate broker instruct the broker who sold to him to deliver to the other who bought from him.[4]

2. The tax is not upon the business transacted but is an excise upon the privilege, opportunity, or facility offered at exchanges for the transaction of the business. It is an excise upon the facilities used in the transaction of the business separate and apart from the business itself.[5] In this view it is immaterial whether the transfer of the account constituted a sale. Unquestionably the petitioners used the facilities of the exchange for offsetting their obligation as a purchasing broker by arranging that another broker should take over that obligation under the rules of the exchange. Such a transaction comes within the intent of the statute and renders petitioners liable for the tax.

3. Under the rules and practice of the Cotton Exchange the transaction taxed was an actual sale. The fact that the sale was made for the purpose of transferring a brokerage account is irrelevant. When the petitioners purchased on the exchange the future contracts for their customer the selling broker handed the petitioners a memorandum agreeing to deliver at the date and price therein specified and the petitioners gave the selling broker a similar purchase memorandum. This each was required to do by the by-laws of the exchange. As a result of the operations of the clearing house the petitioners would, at the close of the day's business, be under obligation to pay the clearing house upon delivery being made at the future date and they would have a correlative right to receive from the clearing house the cotton purchased. Although the broker who made the sale to the

---

[4] Treasury Regulations 40 under R. A. 1918, Articles 23 (a) and 33 (3) (c). Treasury Regulations 71, Articles 44 (a) and 125 (3) (c).

[5] *Nicol* v. *Ames*, 173 U. S. 509, 519, 523.

petitioners would have a right to receive from his principal the necessary cotton to make delivery according to the sale, and although the petitioners who had bought the cotton would be under an obligation to their customer to deliver to him, both brokers were, under the by-laws of the exchange, principals in the transaction. When, therefore, the customer ordered the transfer of the account the petitioners could only effect this by selling the futures to the substituted broker who, in turn, became obligated, so far as the exchange was concerned, as principal, to accept delivery of the cotton according to his purchase from the petitioners. The obligation assumed by the petitioners when they entered into purchase contracts could be satisfied by making payment to the clearing house or offset by selling to another broker and so obtaining that broker's contract to take delivery of the cotton from the clearing house. In no other way could the petitioners relieve themselves of that obligation.

The judgment is *Affirmed.*